IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DELORIS A. WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:08-CV-0827-SRW |
| | ) (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Deloris A. White brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On May 19, 2006, plaintiff filed an application for disability insurance benefits and supplemental security income. On April 23, 2008, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on May 27, 2008. The ALJ concluded that plaintiff suffered from the severe

impairments of "hypertension, vision defect, major depression, borderline intellectual functioning, lumbar degenerative disc disease, status post gunshot wound to the head, and chronic obstructive pulmonary disease (COPD)." (R. 9). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform her past relevant work as a sewing machine operator. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On August 19, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985

F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff claims disability due to headaches, memory problems, and pain in the knees, ankles, hands, and fingers. (R. 126). The plaintiff suffered a gunshot wound to the head in 1991, which she contends is the cause of her severe headaches. (R. 256). Since she was shot, the plaintiff has been employed, *inter alia*, as a sewing machine operator, a hand packer, and a poultry processor. (R. 44-45).

Dr. Kurt D. Kraft treated the plaintiff from April 22, 2003 through June 16, 2005 for chronic pulmonary disease ("COPD"), hypertension, high cholesterol, pneumonia, acid reflux, and leg pain. (R. 213-26). Over this two year period, the plaintiff complained of headaches on two different occasions. (R. 221-22, 215-16). Dr. Kraft, however, never treated the plaintiff directly for her headaches. Instead, he treated the plaintiff for her other ailments, including COPD, pneumonia, high cholesterol, and hypertension. (Id.). Over the course of treatment rendered to the plaintiff, Dr. Kraft never opined that the plaintiff was disabled, nor did he impose work related limitations.

The plaintiff presented to the Wiregrass Medical Center on May 3, 2006. (R. 234-42). Her chief complaints were neck pain and headaches. She described the pain as a 10 on a 10-point scale. (R. 237). The examining physician diagnosed her with cervicalgia and headache. (R. 242). A CT brain scan was performed on May 3, 2006 to assess the plaintiff's complaints

of headaches. The radiology report stated that there was a "prominent sulcal pattern of the frontal lobes" that was "thought to be due to atrophy." Also, the "metallic density along the base of the brain [was] presumably from [a] previous gunshot wound." According to the report, this suggested a clinical correlation with the complaint of headaches. (R. 248).

Two days later, on May 5, 2006, the plaintiff sought treatment from Dr. David H. Arnold. The plaintiff complained of neck pain, and stated that she could not turn or twist her head. She also reported that her "head feel[s] tight." She explained to Dr. Arnold that she had visited the emergency room where a CT scan was performed; she said that her CT scan was normal. The treatment notes indicated that "[t]he patient is generally healthy. There are no ongoing medical problems. The patient has no serious medical illness or injuries, generally carries out normal daily activities without difficulty." Dr. Arnold noted that there was tenderness in the "posterior neck" and "bilateral trapezius" areas with spasm and decreased "flexion extension." His assessment was muscle spasm. He prescribed medication and told the plaintiff to rest and apply heat. (R. 294).

Dr. Walter Jacobs performed a consultative mental status examination on September 13, 2006. The plaintiff's chief complaint was her gunshot wound to the head. When asked to describe her symptoms, the plaintiff stated that she has headaches, joint pain, and cramping in her hands and feet. Dr. Jacobs noted that the plaintiff's referral did not contain medical records pertaining to these allegations. The plaintiff denied ever being treated for psychological or emotional problems. She stated that her sleep was of "variable quality," and her appetite and energy were poor. She also reported that she feels sad "all the time," and that she cries "a lot." Dr. Jacob's assessment of the plaintiff indicated that her affect was

normal in range and intensity; her orientation was alert and fully oriented; her remote memory was intact; her conversation was logical and coherent; and her judgment and insight were fair. The plaintiff was able to do simple digit addition, subtraction, multiplication, and division; count backwards from twenty to one; and spell the word "world" forward and backward; but she was not able to do reverse serial sevens. A Wechsler Memory Scale-III (WMS-III) was administered, and the plaintiff's memory score ranged from extremely low on visual, delayed to average for working memory. "In general, her scores were low average to borderline," a result which the examiner viewed as consistent with intellectual functioning. Dr. Jacobs diagnostic impression of the plaintiff was "Major Depression, Single Episode, Mild" with "Borderline Intellectual Functioning." He indicated that he believed that the plaintiff would benefit from antidepressant medication, and that he would not expect significant change in the plaintiff from a cognitive perspective over the next six to twelve months. (R. 252 -54).

Dr. Vijay Vyas performed a consultative physical examination on September 19, 2006. The plaintiff complained of severe headaches due to the gunshot wound to her head. Dr. Vyas opined that all systems generally were normal. He did note that the plaintiff's shoulders were "vaguely tender," and that there was tenderness in both wrists "on the palmar side," in the "proximal and middle interphalangeal joints," in the lumbar area, and in the ankles. The doctor also reported uncorrected vision of 20/100 in the right eye and 20/70 in the left eye. His impression was that the plaintiff had "[h]istory of gunshot wound to the head with persistent chronic headaches"; "[a]nxiety and depression"; "[e]ssential hypertension, poorly

5

controlled"; "[g]eneralized arthralgia and lumbosacral pain, could be Degenerative Joint Disease, cannot rule out gout or other etiology"; and "[h]istory of smoking with some chronic cough."  (R. 256-59).  Dr. Vyas did not suggest that the plaintiff was disabled, nor did he impose any functional limitations.

On October 2, 2006, Wiregrass Total Eye Care performed a consultative visual examination on the plaintiff.  The plaintiff's corrected vision was reported as 20/40 in the right eye and 20/50 in the left eye for distance and 20/30 for both eyes for reading. The visual examiner diagnosed the plaintiff with refractive amblyonia, astigmatism, cupping of optic nerves in excess of statistical normal, and photosensitivity. Normal muscle function was noted with probable useful binocular vision with glasses.  The examination revealed that the plaintiff "perhaps" has depth perception, and that her color perception was not normal.  The examiner noted that the plaintiff would need more tests to determine her depth and color perception after her visual acuity was corrected with glasses.  Her prognosis was "probably good," with the treatment recommendation of bifocals.  The only limitation placed on the plaintiff was to avoid bright ambient lighting conditions.  (R. 260-61).

Dr. Donald Hinton completed a Mental RFC Assessment on October 3, 2006.  Dr. Hinton concluded that the plaintiff is moderately limited in her ability: to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to change in the work setting. His assessment noted that the plaintiff is "[a]ble to understand and remember simple and detailed but not complex instructions"; "[a]ble to sustain attention/concentration for two

6

hour periods to complete a regular workday at an acceptable pace and attendance schedule"; not significantly limited in social interaction; and "able to respond to (at least) simple/infrequent changes in routine." (R. 284-86).

On November 1, 2006, a disability examiner completed a Physical Residual Functional Capacity (RFC) Assessment, indicating that the plaintiff was capable of work activities at a light exertional level with no climbing of ladders, rope, or scaffolds; avoidance of all exposure to unprotected heights and hazardous machinery; and no more than occasional work in bright sunlight. The assessment also noted that the plaintiff's far visual acuity was limited. (R. 276-83).

Dr. Arnold continued to treat the plaintiff through May 30, 2007. Dr. Arnold treated the plaintiff for COPD, hypertension, and arthralgia. (R. 292-97). Dr. Arnold's treatment notes for May 8, 2007 described the plaintiff as a "healthy adult," and found that all of her systems were normal. (R. 292). On May 30, 2007, he again noted no abnormal findings on physical examination and specifically that the plaintiff had "no unusual headaches" and "no blurred vision." (R. 291). During the course of treatment rendered by Dr. Arnold, he never opined that the plaintiff was disabled, nor did he impose any work related limitations.

In 2005, the plaintiff quit her job as a sewing machine operator. She testified at the administrative hearing, conducted on April 23, 2008, that she quit because the work "made [her] back hurt, [her] knee got where they would swell, [her] ankle would swell and [her] head would be pounding like it was trying to explode." (R. 24). She later testified, when the ALJ asked her why she could no longer do her job as a sewing machine operator, that it was

7

because she "can't move [her] hands the way [she] used to," and because she "can't sit there." (R. 40).  The plaintiff also testified that she suffered from headaches (R. 24, 27, 31), and double vision. (R. 27).  A vocational expert testified that a person with the functional limitations described in the Physical (R. 276-83) and Mental (R.284-87) RFC Assessments, with the additional limitations of occasional far acuity, hearing, and exposure to dust, fumes, and gases, could perform the plaintiff's past relevant work as a sewing machine operator. (R. 46).

     The ALJ concluded that the plaintiff suffered from the following severe impairments: hypertension, vision defect, major depression, borderline intellectual functioning, lumbar degenerative disc disease, status post gunshot wound to the head, and chronic obstructive pulmonary disease (COPD).  (R. 9).  The ALJ determined that

> the [plaintiff] has the [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) and 20 C.F.R. 416.967(b) with no climbing of ladders, rope, or scaffolds; no exposure to dangerous heights or machinery; and no more than occasional far acuity; exposure to bright sunlight; exposure to dust, fumes, or gases; and hearing. The [plaintiff] has retained the ability to understand, remember, and carry out very short and simple instructions with only occasional changes in the work setting.

(R. 14).  The ALJ assigned "significant weight" to the records provided by Dr. Arnold, and the opinion embodied in the Mental RFC Assessment performed by Dr. Donald E. Hinton. (Id.). The ALJ noted that "[t]he record does not contain any opinions from treating or examining physicians indicating that the [plaintiff] is disabled or even has limitations greater than those [described in his RFC assessment]."  (R. 16).

The plaintiff challenges the Commissioner's decision, arguing that the ALJ erred as a matter of law when he failed to find that the plaintiff's headaches were a severe impairment. (Plaintiff's brief, p. 5). Pursuant to 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ is required to apply a five-step sequential evaluation process when determining whether a claimant is disabled. Powell on behalf of Powell v. Heckler, 773 F.2d 1572, 1575 (11th Cir. 1985). The second-step of the sequential evaluation process requires the ALJ to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). The severity of an impairment "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

In this case, the ALJ found that plaintiff has a "severe" impairment of "status post gunshot wound to the head[,]"-- thus, necessarily concluding that this impairment results in work-related limitations. (R. 9). As noted above, plaintiff told Dr. Vyas that she has had severe headaches ever since 1991, when her ex-husband shot her in the head. (R. 256).[1] The ALJ discussed plaintiff's complaints of headaches, and specifically noted that when she sought treatment at the ER for neck pain and headache in May 2006, the CT scan showed frontal lobe atrophy and "a metallic density at the base of the claimant's brain . . . that resembled a bullet fragment." (R. 10). The ALJ's failure to identify "headaches" as a

---

[1] Plaintiff continued to work until 2005. (R. 104, 127).

separate "severe" impairment – as opposed to considering it as a symptom resulting from the gunshot wound – does not constitute error.

Additionally, even if "headache" is separate from the severe impairment of "status post gunshot wound to the head," any error in failing to list it is harmless because the ALJ found that the plaintiff suffered from other "severe" impairments and, accordingly, proceeded beyond step two of the sequential analysis. See McKiver v. Barnhart, 2005 WL 2297383, at *11 (D. Conn. 2005)(explaining that the failure to make explicit determination at step two is, at most, a harmless error when the ALJ does not screen out the plaintiff's claim at step two, but rather continues with the five-step sequential process); Street v. Barnhart, 340 F. Supp. 2d 1289, 1293-94 (M.D. Ala. 2004)(explaining that the ALJ's failure to list low IQ as severe impairment was harmless error where ALJ referred to plaintiff's "borderline intellectual functioning" in his decision and considered plaintiff's "severe and not severe impairments" in combination in subsequent analysis). Furthermore, at step three of the analysis, the ALJ is required to consider the combined effect of all of a claimant's impairments, including those not determined to be "severe" at step two. The ALJ stated at step three that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 13). This statement sufficiently indicates that the ALJ considered the cumulative effects of all the plaintiff's impairments, both severe and non-severe. See Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002)(accepting the ALJ's statement that the

plaintiff did not have an impairment or combination of impairments listed in Appendix 1 as evidence he considered the combined effects of the plaintiff's impairments).

The plaintiff relies on Williams v. Barnhart, 186 F. Supp. 2d 1192 (M.D. Ala. 2002), to argue that the ALJ's failure to make express findings regarding the severity of her headaches is reversible error. In Williams, the ALJ "simply failed to address" some of the claimant's alleged impairments in the decision, and the decision did not "reveal the extent to which the ALJ evaluated those symptoms or impairments beyond step two of the sequential evaluation process." See id. at 1197-98. In this case, by contrast, the ALJ thoroughly examined the medical evidence, and discussed the plaintiff's complaints of headaches at step four of the sequential analysis while determining her RFC. (R. 14-15). Under these circumstances – even assuming that plaintiff's headaches are a separate impairment – the ALJ's failure to list "headaches" explicitly at step two is not a reversible error. See Perry v. Astrue, 280 Fed. Appx. 887, 894 (11th Cir. 2008)(unpublished opinion)(explaining that the ALJ did not err by not specifically identifying the severe impairments at step two because he enumerated and evaluated all the alleged impairments and symptoms in determining the claimant's RFC); Nigro v. Astrue, 2008 WL 360654, at *2 (M.D. Fla. 2008)(noting that the ALJ did not err at step two by not making an express determination regarding the severity or non-severity of the claimant's impairments because he thoroughly discussed the evidence relating to all of the claimant's impairments and took them into account in determining the claimant's RFC).

The plaintiff further argues that the ALJ erred by not specifying the weight assigned to Dr. Vyas' report. (Plaintiff's brief, p. 8). Specifically, the plaintiff contends that the ALJ's failure to indicate expressly the weight he gave to Dr. Vyas' diagnostic impression that she suffered from "chronic persistent headaches" is particularly problematic "because the VE testified that someone with chronic headaches resulting in marked limitation in the ability to maintain attention and concentrate throughout the work day would have no appropriate work in the national economy." (Id.).[2]

An ALJ is required to "state with particularity the weight he gave different medical opinions and the reasons thereof." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). Dr. Vyas noted an "impression" of, *inter alia*, "[h]istory of gunshot wound to the head with persistent chronic headaches." (R. 259). Even if the ALJ erred by neglecting to state the evidentiary weight he assigned to Dr. Vyas' diagnostic impression explicitly, the error is harmless and does not warrant reversal. First, as noted above, the ALJ determined that plaintiff suffers from the severe impairment of "status post gunshot wound to the head," thereby concluding that she has work-related limitations as a result of the gunshot wound. Thus, even if he did not explicitly say so, it appears that the ALJ credited Dr. Vyas'

---

[2] The VE testified that if plaintiff were limited as stated in the RFC ultimately found by the ALJ – with the additional limitations "that because of chronic headaches, she would . . . have a marked limitation in the ability to maintain attention and concentration throughout the workday. . . . [and] a marked limitation in the ability to interact appropriately with coworkers and supervisors" – she would not be able to sustain any work in the national economy. (R. 45-47). However, Dr. Vyas did not indicate any such marked limitations, nor did any other treating or consulting physician do so. While plaintiff testified to marked or extreme limitations due to headaches, she does not argue that the ALJ's credibility determination was flawed. Plaintiff acknowledges that "the ALJ is not required to accept all testimony as true." (Plaintiff's brief, p. 8).

"impression." Additionally, as the ALJ noted in his decision, Dr. Vyas did not indicate or recommend any work-related limitations. (R. 12). Even if Dr. Vyas' diagnosis of "[h]istory of gunshot wound to the head with persistent chronic headaches" were not encompassed within the ALJ's finding of "status post gunshot wound to the head," a diagnosis alone does not establish severity and is an insufficient basis for a finding of disability. Findings regarding severity, residual functional capacity and – ultimately – disability depend, instead, on the work-related limitations resulting from medically determinable impairments. See Wind v. Barnhart, 133 Fed. Appx. 684, 690 (11th Cir. 2005)(at step two severity determination, "a diagnosis . . . is insufficient; instead, the claimant must show the effect of the impairment on her ability to work"); Sellers v. Barnhart, 246 F. Supp. 2d 1202, 1211 (M.D. Ala. 2002). Dr. Vyas' diagnostic impression of "[h]istory of gunshot wound to the head with persistent chronic headaches," without any indication of resulting functional limitations, does not contradict the ALJ's step two determination, his RFC determination, or his ultimate conclusion that the plaintiff is not disabled. Cf. Caldwell v. Barnhart, 261 Fed. Appx. 188, 190-91 (11th Cir. 2008)(failure to state weight given to medical opinion was harmless error where the *functional limitations* stated in that opinion did not contradict the ALJ's findings).

The plaintiff argues further that the ALJ erred as a matter of law when he failed to order additional medical testing of the plaintiff's vision impairments. (Plaintiff's brief, p. 11). The ALJ is charged with developing a fair and full record. Todd v. Heckler, 736 F.2d 641, 642 (11th Cir. 1984). Consultative examinations are not required by statute; however,

13

the Commissioner's regulations provide for them where warranted.[3]  See 20 C.F.R. §§ 404.1517, 416.917.  While it is reversible error for an ALJ not to order a consultative examination when the evaluation is necessary for him to make an informed decision, Reeves v. Heckler, 734 F.2d 519, 522 n. 1 (11th Cir.1984), the ALJ is not required to order a consultative examination unless the record, *medical and non-medical*, establishes that such an examination is necessary to enable the ALJ to render a decision.  Holladay v. Bowen, 848 F.2d 1206, 1210 (11th Cir.1988)(citing Ford v. Sec.of Health & Human Svcs., 659 F.2d 66, 69 (5th Cir.1981))(emphasis added). Thus, the regulations "[do] not require absolute certainty; [they] require[] only substantial evidence to sustain the Secretary's findings." Holladay v. Brown, 848 F.2d 1206, 1210 (11th Cir. 1988).  In evaluating whether the record contains sufficient evidence for the ALJ to make an informed decision, "we are guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Robinson v. Astrue, 2010 WL 582617, at *6 (11th Cir. 2010) (citing Brown v. Shalala, 44 F.3d 931, 935 (11th Cir.1995))(quotations omitted).

Here, there was substantial evidence in the record to allow the ALJ to make an

---

[3] Those regulations provide:

> (a)(1) *General*. The decision to purchase a consultative examination for you will be made after we have given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnoses, and prognosis) is readily available from the records of your medical sources.
>
> (b) *Situations requiring a consultative examination*. A consultative examination may be purchased when the evidence as a whole, *both medical and non-medical*, is not sufficient to support a decision on your claim.

20 C.F.R. §§ 404.1519, 416.917 (emphasis added).

informed decision. The record was thoroughly developed including consultative physical, mental and visual examinations, twelve years of medical records, a Physical and Mental RFC Assessment, and the plaintiff's own testimony. The ALJ addressed the consultative visual examination, and noted that the plaintiff's "vision improved remarkably with best correction; her prognosis was 'probably good'; and the only activity that needed to be avoided was that with bright ambient lighting conditions." (R. 12). The visual consultative examiner noted that plaintiff's color perception – "[t]ested [without] correction" – was not "normal," and that her depth perception was "perhaps" present, but indicated that color blindness and depth perception should be tested after plaintiff's visual acuity had been corrected for two months. (R. 261). However, the plaintiff does not allege that she is color blind or lacks depth perception, nor does she allege that any deficiencies in color or depth perception were the reason she quit her job as a sewing machine operator. The plaintiff's only complaints concerning her eyesight were occasional blurred or double vision (R. 27, 215). When the ALJ asked plaintiff why she quit her job as a sewing machine operator, however, the plaintiff did not refer to any vision deficiencies. She first replied that she quit working because her back, ankle and head hurt, her knee would swell, and she could not handle the pressure. (R. 23-24). Later, when the ALJ asked why she could no longer work as a sewing machine operator, plaintiff stated that it was because she "can't move [her] hands the way [she] used to," and because she "can't sit there." (R. 40). In the disability report completed with her application, plaintiff stated, "I last worked at a sewing factory. I had to stop working due to problems with my hands and fingers." (R. 126). The plaintiff's lack of any complaint

15

concerning her color vision or depth perception, coupled with the visual examiner's sole limitation of avoidance of ambient light conditions (R. 261), constitutes substantial evidence in the record for the ALJ to make an informed decision. Therefore, the plaintiff has failed to demonstrate evidentiary gaps in the record which have resulted in prejudice requiring remand.

The plaintiff also argues that the ALJ erred as a matter of law when he determined that the plaintiff could perform her past relevant work as a sewing machine operator. (Plaintiff's brief, p. 10). Specifically, the plaintiff contends that the ALJ's determination is not supported by substantial evidence because: (1) the DOT's Selected Characteristics of Occupations states that work as a sewing machine operator requires "occasional" color vision and "frequent" depth perception; and (2) the consultative visual examination indicated that the plaintiff "has problems with depth perception" and "may in fact be color blind but at a minimum her color perception was not normal." (Id.). Plaintiff further argues that "[t]he ALJ has not shown any reason to refute the medical opinion regarding [her] depth and color perception limitations," and that "his failure to discredit the depth perception and color perception limitations requires this court to take them as true." (Id. at p. 11).

The plaintiff overstates the vision examiner's report. The vision examiner indicated that depth perception is "perhaps" present, and put a question mark where the examination form states, "Color Blind." (R. 261). While he did write "No" where the form has a space to indicate that color perception is "normal," he further noted that plaintiff was "[t]ested without correction." As to both depth and color perception, the examiner indicated that

plaintiff would need to be tested after her visual acuity had been corrected. (Id.). A fair reading of the report is that the examiner could not determine whether plaintiff suffered from color or depth perception problems until after her visual acuity was corrected. As discussed above, the plaintiff has not claimed that she has color or depth perception problems, nor did she claim or testify that such problems prevented her from performing her job as a sewing machine operator. The plaintiff bears a heavy burden of showing that she is unable to perform her past relevant work. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005); Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The consultative vision examination does not establish, as plaintiff argues, that she is unable to perform her past relevant work as a sewing machine operator.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and a proper application of the law. Accordingly, the decision is due to be AFFIRMED. A separate judgement will be entered.

Done, this 28th day of April, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE